**FILED- MQ**
April 21, 2022 11:22 AM
Clerk of Cout
U.S. DISTRICT COURT
WESTERN DISTRICT OF Michigan
BY:_____slk_____ / \

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Tricia Martinez, | ) | CIVIL ACTION NO. **2:22-cv-83** |
|     Plaintiff, | ) | Jane M. Beckering - District Court Judge |
| | ) | |
| v. | ) | |
| | ) | |
| Rich Wolowski, | ) | **VERIFIED COMPLAINT FOR** |
|     Chief Executive Officer of Gordon Food | ) | **PUNITIVE AND MONETARY** |
|     Store In his personal and professional | ) | **DAMAGES AND DEMAND FOR** |
|     capacity, Defendant. | ) | **GRAND JURY EMPANELMENT FOR** |
| | ) | **CRIMINAL VIOLATIONS** |
| Ted Finco, | ) | |
|     Store Manager of Gordon Food Store In | ) | |
|     his personal and professional capacity, | ) | **TRIAL BY JURY DEMANDED** |
|     Defendant. | ) | |
| | ) | |
| | ) | |
| Doug Bordeau, | ) | |
|     Assistant Manager of Gordon Food Store | ) | |
|     In his personal and professional | ) | |
|     capacity, Defendant. | ) | |

"Those who would give up essential **Liberty**, to purchase a little temporary **Safety**, deserve
neither Liberty nor Safety." Benjamin Franklin

### COMPLAINT

Plaintiff, Tricia Martinez, brings this action to obtain redress for the intentional and purposeful

deprivation of Plaintiff's rights, criminal actions and forcing of non-consensual medical intervention without

a license. Defendant's, acting with joint participation with the State of Michigan engaged in a conspiracy to

deprive Plaintiff of her federally protected God-given rights as store manager's and CEO of Gordon Food,

Your Local Grocery Store (hereafter Gordon Food Store) in their personal and professional capacity.

Defendants caused the intentional infliction of past, present and future emotional distress as hereafter alleged.

## JURISDICTION AND VENUE

1.   The "judicial power [of the United States] shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States".

2.  This court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)(4).  This Court has subject matter jurisdiction over the Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

3.   Venue is proper pursuant to 28 U.S.C. § 1391(b) because all of the acts and omissions giving rise to Plaintiffs' claims occurred in Marquette County in the State of Michigan and is thus within the United States District Court for Western District of Michigan.

4.   This action arises under 42 U.S.C. § 1983 to redress deprivations of Plaintiff's rights through acts and omissions that Defendants committed under color of law as willful participants in joint activity with the State aud/or its agents.

## PARTIES

5.     Plaintiff, Tricia  Martinez, at all times relevant has been a resident of Baraga County, Michigan. 25537 Nelson st, Michigamme MI 49861

6.     Defendant, Rich Wolowski CEO of Gordon Food Service. Which is located in Wyoming, MI. 1300 Gezon Pkwy SW Wyoming MI 49509

7.     Defendant, Ted Finco, store manager of Gordon Food Service. which is located in Marquette, county of Marquette. 3480 us 41 Marquette MI, 49855

8.     Defendant, Doug Bordeau, assistant manager of Gordon Food Service. which is located in Marquette, county of Marquette. 3480 us 41 Marquette MI, 49855

## FACTUAL BACKGROUND
### The COVID Pandemic is a Fraud

9.     A pandemic is a sudden infectious outbreak that becomes very widespread and affects a whole region, a continent, or the world with a high degree of mortality.  For decades we have

experienced seasonal influenza with up to eighty million 80,000,000 cases in a year.

10.    The current published numbers for the Corona Virus Disease of 2019 (hereafter COVID-19 or COVID) "pandemic" are around 49,000,000 "cases" in the US which are artificially and purposefully inflated.

11.    The all-cause mortality for the elderly population over 80 for 2020 compared to 2021 has not changed with any statistical significance despite that population having a 99% vaccination rate according to the Centers for Disease Control and Prevention (hereafter CDC).

12.    The number of deaths has been inflated due to faulty models, inaccurate tests and improper classification of COVID deaths.

13.    The reporting guidelines that the CDC normally used for the last 17 years to calculate fatalities were suddenly changed on March 24th, 2020[1].

14.    This change resulted in a reported fatality rate that was 94% higher than deaths attributable to COVID alone.

15.    The actual death rate from COVID is actually extremely low with the seasonal flu posing a bigger threat for most Americans.

### Faulty Models

16.    At the very beginning of the manufactured pandemic in March 2020 the Imperial College publicly released its now severely discredited research report predicting that 2 million Americans would die without swift action[2].

17.    Even more unscrupulously the report forecast 1.1 million Americans would die within the coming months despite any efforts.

18.    The report failed to mention that the people over 80 had a likelihood of death 100 times more than those under 50.

19.    Two weeks later under scrutiny of the projections and methods the number of deaths was

reduced by 96% by the Imperial College report's creators.

20.     As the manufactured pandemic progressed the absolute numbers were
continuously adjusted downward.

21.     The panic generated was not to be undone as the revised numbers never made
the mainstream media like the initial inaccurate numbers that were publicized.

22.     Once the low death rate and questionable reporting was revealed, the CDC tried to bury
this finding on its website.

23.     The narrative to continue the "pandemic" then shifted to the number of "cases" instead of
fatalities.

24.     The tracking of cases is a relatively meaningless metric as is does not provide any insight
into infectivity, severity, transmissibility or impact or lack thereof on an individual.

25.     Consistent with the inflated number of deaths from COVID, the number of "cases" were
distorted.

### Inaccurate Tests

26.     There has not been a proper test developed to accurately detect COVID-19.

27.     There has never been a purified sample of the virus as a control to accurately calibrate the
testing.

28.   As a result, there is no test that can accurately and repeatedly detect a case of COVID-19.

29.  The result is a high percentage of false positives[3],[4].

30.     The literature on false positive is numerous and is well documented in the
scientific community.

31.     Cases were determined through a polymerase chain reaction (hereafter PCR) test after a
nasal swab sample.

32.    The PCR technique was developed by the late Dr. Kary Mullis for use in the lab to amplify nucleic acid for research purposes.

33.    Dr. Mullis was awarded a Nobel Prize in Chemistry for his role in the invention of the PCR technique.

34.    This PCR test was never intended to be used to diagnose an infectious disease as Dr. Kary Mullis himself stated.

35.  There was never a proper control sample used to calibrate the PCR test[5].

36.  If you cycled the PCR test enough you would always get what you were looking for, a positive result. Consequently, the PCR test was erroneously applied and was cycled more than necessary and as a result inflated the number of cases.

37.  This led to a high number of false positives and the eradication of detection of the influenza for the 2020 flu season.

38.    This discovery is the reason why Florida began requiring labs to report the number of cycles to discern the real cases from the false positives.

39.  Disturbingly, the CDC's own PCR guide[6] confirms the above as released July 21, 2021:

a.    Amplification technologies such as PCR are sensitive to accidental introduction of PCR product from previous amplifications reactions.

b.    Test performance can be affected because the epidemiology and clinical spectrum of infection caused by 2019-nCoV is not fully known.

c.    Detection of viral RNA may not indicate the presence of infectious virus or that COVID the causative agent for clinical symptoms

d.    The performance of this test has not been established for screening of blood or blood

products for the presence of 2019-nCoV

    e.          This test cannot rule out diseases caused by other bacterial or viral pathogens

    40.    Most "cases" of COVID were actually false positives based on the flawed PCR testing.

    f.          The flu continued to exist, but its tracking was deceptively eliminated by focusing on COVID as the only possible infectious disease.

    41.    A reported "case" of coronavirus referred only to a positive test result showing someone has been infected.  It did not mean that a person will become sick or hospitalized or die.

    42.    Incentives were given to classify deaths as COVID deaths by giving higher reimbursements to hospitals for COVID patients.  Many states assumed that anyone with a positive COVID test died from the disease regardless of the actual cause of death.  As the director of the Illinois Department of Public Health said, "if you were in hospice and had already been given a few weeks to live, and then you were also found to have COVID, that would be comited as a COVID death."

    43.    Deaths from the flu up to 80 million in some years have been occurring for decades.

    44. These deaths would occur each year without a second thought.

    45.    In contrast, each death from COVID, real or imagined, was highlighted in the media to stoke fear.

    46.    This led medical legal expert Dr. Mark McDonald to declare the true public health crisis was not COVID but the fear of infection (real or imagined) which has morphed and evolved into a form  of mass delusional psychosis.

    47.    Other states and instances counted people who died of gunshot wounds as dying from COVID.

48.   In September of 2021 Norwegian Institute of Public Health reclassified COVID-19 as no more dangerous than ordinary flu which predictably received no media attention.

49.   The FDA has admitted there is no specific tests for the variants that arise.

### Better, Cheaper and More Effective Interventions than the Vaccines

50.   In normal and sane times, the medical community tries to treat illness to prevent people from getting admitted to the hospital.

51.   Several affordable and extremely effective early interventions exist for the treatment of COVID-19 including but not limited to hydroxychloroquine, ivermectin, budesonide, zinc and vitamin D.

52.   All of these therapies have been around for decades and have significantly quantified safety profiles through years of clinical research.

53.   Recent research has indicated an aggressive campaign to compel people to take vitamin D at the beginning of the "pandemic" could have prevented nearly all COVID deaths[7]

54.   In contrast, the vaccine was rushed to development and has no long-term safety or efficacy data.

55.   Numerous effective early interventions have been abandoned for the lure and profit of the "vaccine".

56.   To further push the need for a vaccine narrative CDC changed its definition of vaccine and vaccination to fit with the current therapies being pushed.

57.   The current COVID vaccines are not really vaccines at all by definitions used until around March of 2020.

58.   They are gene therapies that are being pushed for profit.

59.    Changed the definition of herd immunity by WHO.

60.    Despite all the attempts to fan the flames of fear from COVID the US death rate in 2020 and 2021 was unchanged from 2019[8].

61.    The mischaracterization of cases and deaths from the SARS CoV-2 virus has been used to impose unlawful actions and exploit rights under the color of law.

62.    People have woken up and are fighting back against the systematic violation of rights in the setting of a "pandemic" based on false premises.

### Constitution Not Suspended in an Emergency

63.    Even if there was a true public health emergency the United States Constitution does not become suspended, and the rights of the people are not halted.

64.    Neither the legislature nor any executive or judicial officer may disregard the provisions of the Constitution in case of emergency[9].

65.    The Constitution is not suspended when the government declares a state of disaster[10].

66.    All government power in this country, no matter how well-intentioned, derives only from the state and federal constitutions. Government power cannot be exercised in conflict with these constitutions, even in a pandemic that was actually real.

67.    It may bear repeating that the Constitution is the Supreme Law of the land and all things repugnant to it are void[11].

68.    The Constitution is the protector of the people against injury by the people[12].

69.    The constitution of a state is stable and permanent, not to be worked on by the temper of the times, nor to rise and fall with the tide of events.  Notwithstanding the competition of opposing interests,

and the violence of contending parties, it remains firm and immovable, as a mountain amidst the strife and

storms, or a rock in the ocean amidst the ranging of the waves[13]

### Separation of Powers and the Doctrine of Checks and Balances

70. This system of checks and balances is a core tenant to the US Constitution.

71. The legislature of Michigan State passes law.

72.     Only the legislature can pass a law in the State of Michigan according to the Michigan

Constitution Article 1V Section 1

73. The legislature may not delegate this law-making power.

74. The executive branch enforces law but may pass executive orders.

75. These executive orders apply to the agencies under direct control of the State or Federal

government (DeVore Lawsuit).

76.     During the COVID "pandemic" the governors of many states issued executive orders. These

orders do not have the force of law but have been commonly misinterpreted as such by law enforcement,

government agencies, lawyers and businesses. This basic discussion a core concept to today's confusion.

For example, the national chain Menards locally had signs that stated, "According to Michigan State law

masks are required".

77.     Further, government agencies have been corrupted and twisted. CDC guidelines are not

laws. CDC is not a legislative body of the federal government. The guidelines that are released are

recommendations only and do not have the force of law.

78.     The former lays bare the false arguments that have been repeatedly used to justify the

actions of businesses, individual and government that their actions are due to Executive Orders or CDC

guidelines.

79.     Any such actions would be tantamount to vesting the executive branch and its agencies

with the full power of the legislature during times of a declared emergency, which proposition would be fraught with all sorts of legal and constitutional issues.

80.     If such was the case, the separation of powers would be a nullity and the executive branch would be free to rule the State at will.

81.     Even if the executive and administrative dictates were to somehow stand due to some faulty ruling of law, they would have a high threshold of due process to carry out their intended proclamations.

82.     According to New Michigan Public Health Law

83.     The store's policy is unlawful under international, federal, constitutional and state law. It is also irrational and discriminatory and violates the Plaintiff's equal protection rights.

84.     It is well established by evidence-based science that the vaccines available to protect against SARS-CoV-2 are not able to provide sterilizing immunity. From the beginning, public health officials acknowledged that SARS-CoV-2 vaccines would likely provide personal protection from serious symptomatic disease, but the vaccines were not designed to stop infection and transmission of the virus.

85.     The Centers for Disease Control ("CDC") recently released the findings of a study that confirms the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19 and to end up in the hospital with serious cases of COVID-19 as the unvaccinated. 2

86.     To date, no peer reviewed study supports the assumption that the vaccinated are not able to spread SARS-CoV-2 or are less dangerous than unvaccinated people. On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset that these vaccines cannot provide sterilizing immunity. They were not designed to stop transmission and they do not stop transmission of SARS-CoV-2.

## Natural Immunity is Superior to Vaccination

87.    Defendants seem to operate on the presumption that individuals who are unvaccinated with any variant of the COVID vaccines are somehow disabled.

88.    Natural immunity is far superior to any manufactured immunity and most institutions following these guidelines are ignorant to the fact that having COVID and recovering from it provides more robust and longer lasting immunity than a vaccine can provide[14].

89.    Infection based immunity is broader and deeper.

90.    A natural infection induces hundreds upon hundreds of antibodies against all proteins of the virus including the envelope, the membrane, the nucleocapsid and the spike.

91.    Dozens upon dozens of these antibodies neutralize the virus when encountered again.

92.    This exposure to these proteins causes our T cells to mount a robust memory that will reactivate again if presented with the same virus or similar to eradicate it in our body.

93.    The current variants that are claimed to exist but certainly not proven would definitively be eliminated against a person with natural immunity.

94. In vaccine induced immunity with the currently overutilized mRNA vaccines we mount an antibody response to only the spike protein and its constituent proteins.

95. This produced much fewer neutralizing antibodies which are ineffective against the spike protein as the virus preferentially and naturally mutates at the spike protein level.

96. The antibodies that are vaccine induced are incapable of binding to these mutations.

97. This is the reason Dr. Robert Malone who was one of the co-inventors of the mRNA vaccines in the 1980's unquestionably calls the mRNA vaccines "leaky" as they provide no sterilizing immunity, allow mutations to pass through and push the more virulent variants into existence that are now resistant to the vaccine resulting in a worsening of the severity of COVID at the community level.

98.     The current practice of mass vaccination is similar to administering mass antibiotics to a population where you will invariably get antibiotic resistant strains due to over and indiscriminate use.

99.     Simply stated, you can't vaccinate your way out of a pandemic, real or imagined and the process of mass vaccination simply selects the most resistant SARS COVID 2 variants to propagate producing precisely worsening the situation.

100.     This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity. Individuals who were both previously infected with SARS-CoV-2 and given a single dose of the vaccine gained additional protection against the Delta variant.[15]

101.     This is also substantiated by the declaration of Dr. Jay Bhattacharya, Director of Stanford University's Center for Demography and Economics of Health and Aging that natural immunity is overwhelming proven to conclude that natural immunity provides equivalent or greater protection against severe infection than immunity generated by COVID-19 vaccines.  This conclusion was based on studies from Qatar which tracked 927,321 individuals for six months after COVID vaccination, California which tracked the infection rates from over 5 million patients vaccinated with two Pfizer doses and US Veterans which tracked 620,000 vaccinated participants.

102.     This is further underscored by the leading cardiologist Dr. Peter A. McCullough that the COVID-19 vaccines do not prevent transmission of the disease among the vaccinated or mixed vaccinated/unvaccinated populations, and that mandatory COVID-19 vaccines for hospitals do not increase safety for employees or hospital patients.  Because of the progressive mutation of the spike protein the virus has achieved an immune escape from the COVID vaccines.  The variants are not adequately covered by the vaccines

103.     The immunity from vaccine wanes hence the need for repeated injections and boosters.

104.     The irony of all this, therefore, is the fact that the vaccinated are much less protected compared to unvaccinated individuals, carry higher viral loads, are more infectious and are the driving force behind new variants.

105.     Discriminating against the unvaccinated is scientifically ignorant.

### Vaccines are Not Effective with Questionable Safety

106.     The vaccines cause a 127% increase in the risk of heart attacks[16].

107.     The Pfizer vaccine in the initial stages of implementation to the public had a death rate of 1 in 37 as revealed in Pfizer's court ordered release of its research data in December of 2021.  This is the same data that Pfizer fought to keep private and unavailable for release until 2076.

108.     Defendant did not issue the discriminatory Mask Mandate based on any science that showed it was necessary or appropriate (or even safe) to impose burdens on the unvaccinated but not the vaccinated. Rather, in his official capacity, Defendant promulgated the discriminatory regulation as part of a political strategy to coerce people into participating in the experimental

110.     Not only are Defendant's actions violating numerous constitutional, federal and state-protected rights they are based on scientific ignorance.

111.     This is with good reason since the orchestrated public messaging campaign that the "Vaccines" are safe and effective and a "passport" back to freedom.

112.     This may be why Defendants have been emboldened to commit criminal and civil violations but the Defendant's defended their actions after being put on notice of the violations they were committing.

113.  Defendants may feel that because other business were following the same customs of committing civil and criminal offenses they were justified in their actions.

114.   As of this writing the new manufactured Omnicron variant was shown to be predominantly

in the vaccinated population.

115.    As of this writing, the double and triple vaccinated accounted for 4 out of 5 deaths

in England between of November 15 and December 12th, 2021[17].

116.    It is a well-established tenant of tort law that customs of action do not meet the definition

of proper behavior[18].

117.    No  reviewed study has yet found that widespread use of cloth masks or reusable surgical

masks can mitigate the spread of SARS-CoV-2 or any other similar aerosolized pathogens. At best, there

are hypothetical "modeling" studies which are inherently unreliable and subject to layered, flawed

assumptions. Thus far, the models have not been established to be true by any hard science.

118.    The only randomized controlled trial of cloth masks showed that cloth masks actually

increase the risk of health complications and spread of disease rather than help stop its spread. Based on

this study, guidelines were updated to recommend that it is safer for healthcare workers to have no mask

than to use a cloth or reusable mask.

119.    The reviewed evidence available shows that serious adverse health outcomes can and do

occur from prolonged mask.

120.    For the reasons set forth in this complaint, Plaintiff respectfully seeks punitive relief

and empanelment of a grand jury to prevent the ongoing criminal violations and violations of her most

basic rights, dignity and safety.

### Masks are Completely Ineffective at Preventing Transmission

121.    The science on the effectiveness of masks is settled—they offer no protection in

the transmission of airborne agents.

122.    Masks are useless in preventing the spread of disease and even further are unsanitary objects

that themselves become vectors for the spread bacteria and viruses.

123.    This is based on the actual scientific literature for the last 40 years and not press releases and

misguided, misinformed mandates.

124.    The proof of mask ineffectiveness is extensive and numerous and dates back as far as 1975 to present day.

125.    The wearing of surgical face mask even has no effect on the overall operating room environmental contamination.  It only serves to redirect the offending projectiles of coughing and breathing[19].

126.    More recently, a meta review done in 2001 found that the evidence for discontinuing the use of surgical face masks would appear stronger than the evidence available to support their continued use[20].

127.    Further, another systematic literature review found that no significant difference in the postoperative wound infection was observed between masked groups and groups who operated with no masks[21].

128.    In 2015 a review of the scientific literature was performed, and it was concluded there is a lack of substantial evidence to support claims that facemasks protect either patient or surgeon from infectious contamination[22].

129.    Most of these are studies that are in a controlled medical environment done by trained medical personnel.  The implications for non-medical people in a non-medical setting with no standards for the sterility or cleanliness of masks is that it would clearly exacerbate the ineffectiveness in the typical civilian setting in which the Defendant works.

130.    The evidence for the complete ineffectiveness of masks at preventing infection is overwhelming and definitive[23]

131.    One may find an aberrant contrary study that has a poor study design or is politically motivated like the CDC's mask study that was released during the "pandemic".

## Masks are Harmful

132.    When facts mattered more than politics before the pandemic the reality is masks in the clinical and even more so in the non-clinical setting do not prevent disease transmission and are in fact counterproductive as a danger and a nexus for the facilitation of disease spread.

133.    Masks have caused children to die when using during physical activity by obvious oxygen deprivation.  Of course, this was unreported by the mainstream media.

134.    Animal studies show without a doubt that breathing even low levels of carbon dioxide causes a spectrum of dangerous adverse reactions in the body such as acidification of the blood and calcification of organs and arterial walls that can lead to worsening coronary heart disease and other serious problems.

135.    The cascade of metabolic changes to the offspring of pregnant mothers exposed to CO2 can also cause permanent neurological damage, birth defects and stillbirths, possibly due to the calcification of the placenta. Which brings us to ask, are masks partly to blame for the concerning 28% rise in stillbirths worldwide during the pandemic?

136.    Experiments confirm that wearing masks, be they surgical, N95, or community-made cloth, leads to a drastic rise in CO2 in the inhaled air under masks, increasing six- to seven-fold in five minutes to as much as sixty-fold in fifteen minutes of measurement.  Breathing air with such high CO2 concentrations increases blood CO2, which in turn acidifies the blood and tissues in the body.

137.    Studies show that elevated CO2 levels cause permanent damage to the unborn pups of pregnant animals exposed to just a fraction of the concentration present in the air under a mask. We also know through studies that adolescent mice show similar developmental impairment and irreversible neuron death from minimal increases of CO2.

138.    The reason the FDA issued the EUA specifying that consent is required, that harms be properly described, and that masks must not be labeled to imply they offer antiviral protection, is

precisely because they are not FDA approved for this use, and their safety, efficacy and health risks are

not properly understood.

139.   So, the uncomfortable truth is that people wearing masks, either voluntarily or under

threat of punishment by their local authorities, are partaking in a grand medical experiment without their

consent. Public officials who mandate masks without mention of their risks, fail in their duty to provide

informed consent by not communicating crucial information to citizens that they need to make educated

medical decisions affecting their personal health. The reality is that a community is comprised of people

with widely varying health status, with each person having a unique history of biological factors and

family predispositions. As cardiovascular disease continues to be the #1 killer to this day in the US and

worldwide, wouldn't it be of utmost importance to communicate the risk of calcification of arteries from

increased $CO_2$ to the millions of people battling this deadly disease? How many other conditions besides

heart disease are worsened by breathing high levels of $CO_2$? Knowing what health factors influence the

severity of adverse effects from wearing a mask is absolutely essential information for individuals to make

the call as to whether this medical intervention is right for them or not. It should always be left up to the

individual to decide if the benefits outweigh the risks.

140.   Even if masks were effective at significantly reducing transmission of a disease, the "greater

good" argument cannot be used to mandate a medical intervention if it comes at the cost of an individual

losing their health or their life in sacrifice to a perceived community benefit. Even the so- called "mild" side

effects of mask-wearing should be more deeply scrutinized. What exactly causes  the metabolic changes

responsible for anxiety, fatigue, headaches, and trouble concentrating and is the damage possibly

permanent?

141.   Increased $CO_2$ impairs children's ability to learn language and empathy, and masked faces

around them harms their emotional development? In Jacobsen vs. Massachusetts, a landmark case on

government-mandated medicine, the US Supreme Court unequivocally ruled that there must be clear public

health benefit to justify the imposition of a medical mandate. There is little, if any, public health

justification in this case as evidence from "gold-standard" mask studies show that facial coverings offer

negligible benefit to the wearer or those in their vicinity when it comes to reducing viral transmission

among the general population. That evidence even suggests that incorrect or long- term use of masks may

increase the risk of transmission, especially with cloth or "community" masks.

## EVENTS GIVING RISE TO CLAIMS

142.    Plaintiff walked into Gordon Food Services on April 21st, 2021, at approximately 1:00pm.

143.    Upon entering, Plaintiff was approached by Defendant Doug Bordeau who was holding a box
of mask.

144.    Defendant persisted and demanded a mask be placed on Plaintiff (hereafter mask
coercion).

145.    Defendant (Store Manager) Ted Finco walked to where the Plaintiff was standing and
demanded she wear a mask.

146.    Plaintiff and the Defendants were not standing 6 feet apart.

147.    Defendants, (male) made the Plaintiff (female) uncomfortable.

148.    Defendant Ted Finco was not wearing his mask over his nose.

149.    Defendants told Plaintiff to leave the store.

150.    Defendants gave Plaintiff the option to do a curbside purchase.

151.    Plaintiff gave Defendants her order, walked out of the store, and to the car.

152.    After about 10 minutes, Defendant Doug Bordeau brought the Plaintiff's order. Plaintiff
gave Defendant a 100.00 bill,

153.    Plaintiff waited for another 10 minutes for the defendants to bring her change.

154. Plaintiff started her car and was ready to back out of the parking lot when Plaintiff observed a Marquette County Sheriff's vehicle had pulled behind her, blocking her in.

155. Plaintiff observed two more Marquette County Sheriff's vehicles pulled in the Gordon Food Store and surrounding the Plaintiff's car.

156. All three Sheriff's surrounded the Plaintiff's car. All three took turns questioning the Plaintiff.

157. Plaintiff was told by one of the Sheriff's that a call was received by dispatch from Gordon Food Store management stating that a woman was shopping in their store was too drunk to drive and were concerned for her safety.

158. Plaintiff was arrested and interrogated for 30 minutes by three Marquette County Sheriffs.

159. Plaintiff was never read Miranda Rights.

160. Plaintiff suffered humiliation, embarrassment, and mental anguish.


### State Action Nexus

161. Defendant acted with joint participation of the State via the perceived mask mandate to achieve their violations.

162. This is evidenced by Defendant's own statements and the sign on the door of Primal that states according to the State of Michigan regulations

163. The Private conduct of the Defendant was as actions of the State itself as The Defendant was using the authority of the State of Michigan to intertwine with his action.

164. Defendant is acting as an agent of the State in implementing the Rules.

165. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents[24]

166. Defendant is a willful participant as agents of the State as they declined to reign in their conduct and policies despite warnings of their civil and criminal nature and even after presented with filed criminal charges against them.

167.   Defendant through their actions appear to have no interest in engaging in lawful conduct and act in defiance of the law through cover as the enforcement arm of the State.

168.   Defendant continued to pressure Plaintiff to wear a mask even after notice of the illegality of his

**CLAIMS FOR RELIEF**
**COUNT ONE**
**VIOLATION OF PROCEDURAL DUE PROCESS**
**U.S.C. § 1983**

169.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

170.   Defendant has labeled Plaintiff as communicable disease threat without a medical license and without medical basis and as a result coerced Plaintiff to wear a mask.

171.   As a result of Plaintiffs refusal to consent to an unwanted medical procedure by an unlicensed individual Plaintiff was **refused service** (emphasis added) at Primal.

172.   Defendant has discriminated against Plaintiff because of this perceived disability acting as agents of the State.

173.   The due process clause of the Fourteenth Amendment requires that action by a state through any of its agencies must be consistent with the fundamentals of liberty and justice[25].

174.   Procedural due process of law is required to properly classify Plaintiffs with an actual communicable disease disability by a licensed physician, verified by a health officer, challenged and/or investigated through a hearing followed by discussion of appropriate intervention

175.   There is a very high threshold that must be met to label someone as a real contagious threat that involves the right of the accused to challenge that assessment.

176.    Michigan Public Health Law MLC 333.5111 outlines the process to process to determine if an individual is a communicable disease threat.

177.    None of the processes outlined in Michigan MLC 333.5111 are authorized to be performed by Defendant as he is wholly unqualified to determine if someone is disabled and actual public health threat.

COUNT TWO
VIOLATION OF SUBSTANTIVE DUE
PROCESS 42 U.S.C. § 1983

178.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

179.    Plaintiff has a protected liberty interest, secured by the Due Process Clause of the United States Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States, to be free from burdens on his constitutionally protected liberty rights.

180.    A requirement to wear a mask violates several fundamental rights, including but not limited to the right to be free from forced medical experimentation.

181.    This right is a fundamental right pursuant to United States Supreme Court jurisprudence but is also recognized as a jus cogens norm under the laws of nations.

182.    As set forth more fully subsequently, the forced administration of an unconsented and ineffective medical intervention is criminal as well as civil in nature.

183.    Plaintiff has a protected liberty interest, secured by the Due Process Clause of the United States Constitution, to refuse non-consensual administration of any objectionable medical product, and/or to be free from the forced administration of medical procedures and devices that Plaintiff reasonably believes may cause him harm.

184.    This is underscored by the fact that the Defendant coercing the non-consensual intervention is an unlicensed medical professional.

185.    Further, Plaintiff has a fundamental right, secured by the Due Process Clause of

the Fourteenth Amendment of the United States Constitution:

      a.    to breathe fresh air;

      b.  to self-determination in matters of medical care and the administration of medical

          products and devices;

      c.    to medical privacy; and

      d. pursuant to the First and Fourteenth Amendment, the right to be let alone,

          personal privacy and the right to bodily autonomy.

186.    The mask coercion, both on its face and as applied, is not sufficiently narrowly tailored, or

lacks a rational basis, as the science establishes that masks are ineffective, and the Plaintiff poses no more

threat than people wearing a mask.  There is no rational reason to impose different burdens on

them and to perpetuate this ignorance and to refuse service to Plaintiff based on his refusal to wear a mask.

187.    Defendant's action is not narrowly tailored, or lacks a rational basis, since as previously

stated, numerous studies have confirmed that masks are not effective against viral spread[26], and

Plaintiff will show at trial that masks are damaging in a variety of way to those who are forced to wear

them consistent with the requirements of the Defendant to receive service.

WHEREFORE, Plaintiff respectfully requests that the Court enter punitive and monetary damages and

such further relief as the Court deems just that Defendants' actions under color of law through a mask

coercion violates Plaintiff's substantive Due Process rights.

### COUNT THREE
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE
### FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
### 42 U.S.C. § 1983

188.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein and further alleges:

189.    By his actions, as described herein, Defendant, acting under color of statute, ordinance, regulation, custom, or usage, snbjected Plaintiff to the deprivation of the rights, privileges, or immunities secured by the Constitution and law.

190.    Defendant's mask coercion violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and corresponding provision of the State of Michigan Constitution) because it forces nonconsenting healthy people into the use of a medical product and face burdens to their medical privacy and ability to breathe, but it allows similarly situated healthy

people in the same businesses and locations to be obtain service because they have submitted to a medical procedure by an unlicensed professional which is unable to provide any infections protection whatsoever.

191.    There is no rational basis for such a distinction as previously outlined. Plaintiff poses no more danger to others than a person who are consenting to an ineffective medical treatment. It is a fact that masked people are equally or even more infectious than unmasked individuals. The policy of discriminating based on an individual's willingness or ability to subject themselves

to ineffective medical intervention by an unlicensed person, restrict their breathing, sacrifice bodily autonomy and facilitate possible harm due to increased $CO2$ levels or risk of infection shocks the conscience and cannot be justified as relating to any rational permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their right to freely opt out of harmful, reckless and unjustified medical intervention.

WHEREFORE, Plaintiff respectfully requests that the Court enter a punitive and monetary damages and such further relief as the Court deems just that Defendant's mask coercion violates Plaintiff's Equal Protection rights.

**COUNT FOUR**
**VIOLATION OF THE NINTH AMENDMENT OF THE CONSITUTION RIGHT TO PRIVACY**
**AND RIGHT TO BREATH FREELY 42 U.S.C. § 1983**

192.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

herein and further alleges

193.    Plaintiff has a protected liberty interest to breath freely secured by the Ninth Amendment to the Constitution.

194.    The mask coercion exhibited by Defendant provided no reasonable basis to restrict Plaintiff's breathing in order to obtain service in the public accommodation Defendant manages.

195.    Further, the means employed by Defendant were, in fact potentially harmful to Plaintiff and could cause a serious medical event, as explained subsequently, when administered by an unlicensed individual on a non-consenting party.

WHEREFORE, Plaintiff respectfully requests that the Court enter a punitive and monetary damages and such further relief as the Court deems just that Defendant's mask coercion violates Plaintiff's Equal Protection rights.

## COUNT FIVE
### PRACTICING MEDICINE WITHOUT A LICENSE
#### Michigan MCLS § 333.17011

196.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

197.    The definition of the practice of medicine is found in: MCLS § 333.17001

Defines a physician as an individual licensed to engage in the practice of medicine. Pursuant to MCLS § 333.17011, an individual cannot engage in the practice of medicine or practice as a physician's assistant unless licensed or otherwise authorized by the Michigan board of medicine. S/he cannot engage in teaching or research that requires the practice of medicine unless the individual is licensed or otherwise authorized by this article.

196.    A mask is a medical intervention. It restricts breathing and consistently drops the individual's oxygen level below the safe threshold of 19.5%.

197.    The requirement of a mask by an unlicensed individual is dangerous as it is associated with an

uneducated assumption of risk.

198. The level of 19.5% as the minimum safe threshold is defined by OSHA regulation 1910.134 (d)(2)(iii).

199.    The rationale for the regulation is explained by OSHA:

Human beings must breathe oxygen . . . to survive, and begin to suffer adverse health effects when the oxygen level of their breathing air drops below [19.5 percent oxygen]. Below 19.5 percent oxygen . . ., air is considered oxygen deficient. At concentrations of 16 to 19.5 percent, workers engaged in any form of exertion can rapidly become symptomatic as their tissues fail to obtain the oxygen necessary to function properly (Rom, W., *Environmental and Occupational Medicine*, 2nd ed.; Little, Brown; Boston, 1992). Increased breathing rates, accelerated heartbeat, and impaired thinking or coordination occur more quickly in an oxygen-deficient environment. Even a momentary loss of coordination may be devastating to a worker if it occurs while the worker is performing a potentially dangerous activiry, such as climbing a ladder. Concentrations of 12 to 16 percent oxygen cause tachypnea (increased breathing rates), tachycardia (accelerated heartbeat), and impaired attention, thinking, and coordination (e.g., Ex. 25-4), even in people who are resting.

At oxygen levels of 10 to 14 percent, faulry judgment, intermittent respiration, and exhaustion can be expected even with minimal exertion (Exs. 25-4 and 150).

Breathing air containing 6 to 10 percent oxygen results in nausea, vomiting, lethargic movements, and perhaps unconsciousness. Breathing air containing less than 6 percent oxygen produces convulsions, then apnea (cessation of breathing), followed by cardiac standstill. These symptoms occur immediately. Even if a worker survives the hypoxic insult, organs may show evidence of hypoxic damage, which may be irreversible (Exs. 25-4 and 150; also reported in Rom, W. [see reference in previous paragraph]).34(d)(2)(iii)

200.    The FDA defines the use or application of any variety of masks as a class 2 medical device.

201.   The class 2 type of devices represent a moderate to high level of associated risk and are subject to both general controls and special controls by FDA, which may include compliance requirements for performance, labeling, clinical testing data, and post-market surveillance.  Other devices classified in class 2 are blood pressure cuffs, pregnancy tests, syringes, blood transfusion devices, powered wheelchairs, contact lenses and software used as diagnostic tools

202. Defendants by forcing a mask upon Plaintiff are practicing medicine without a license.

203.   Defendant is also forcing a mask for a perceived, unnecessary medical reason.

204.   This is even more egregious due to the fact that the Defendants are proceeding without any indication of consent from Plaintiff for their forced medical procedure.

205.  As Plaintiff is well aware, an actual licensed physician requires consent before proceeding with a medical intervention.

206.  Unconsented medical intervention in a non-emergent situation meets the definition of assault and battery.

WHEREFORE, Plaintiff respectfully requests that the Court enter a punitive and monetary damages and such further relief as the Court deems just that Defendant's mask coercion violates Plaintiff's Equal Protection rights.

## COUNT SIX
### DECLARING THE MASK MANDATE UNCONSTITUTIONAL UNDER THE UNITED STATES CONSTITUTION AND CORRESPONDING SEPARATION OF POWERS CLAUSE OF THE MICHIGAN CONSTITUTION

207.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

208.   As previously mentioned, only the legislature can make laws.  Further, the legislature cannot delegate this lawmaking authority according to Article 4, Section 1 of the State of Michigan

Constitution.

209.   The United States Constitution establishes three separate but equal branches of government: the legislative branch makes the laws, the executive branch enforces the laws, and the judicial branch interprets the laws. The Framers structured the government in this way to prevent one branch of government from becoming too powerful and to create a system of checks and balances.

213.   The current perceived Mask Mandate, issued by the State of Michigan Department of Health unbalances this constitutional framework by allowing the executive branch to issue directives with the force of law without proper delegation from the legislature.

214.   Plaintiff also has a clear legal right to breathe freely and opt out of participating in Nonconsensual medical intervention, to medical privacy, to refuse medical interventions that he reasonably believes may cause him harm, and to bodily autonomy.

WHEREFORE, Plaintiff respectfully requests that the Court enter a punitive and monetary damages and such further relief as the Court deems just that Defendant's mask coercion violates Plaintiff's Equal Protection rights.

## DAMAGES

215.   Due to the egregious actions of the Defendant(s) after being informed of the full knowledge of his criminal and civil actions Plaintiff hereby demands monetary damages of **$450,000.00 (four hundred and fifty thousand US dollars)** for discrimination, civil rights violations, mental anguish, embarrassment, coercion and as a punitive deterrent against similar behavior in the future.

216.   Due to the aforementioned violations, Plaintiff demands the empanelment of a grand jury to for evaluation of criminal activity as outlined below.

217.   Due to the aforementioned violations, Plaintiff requests further relief as the Court deems just given the overt violations of Defendant.

## DEMAND FOR EMPANELMENT OF A FEDERAL GRAND JURY

218.  All acts complained of shall be deemed to have been committed under color of official right, and committed knowingly, intentionally, and willfully, and with full and prior knowledge of the law and the facts applicable, relevant, and germane to the incident complained of as several opportunities have been given for administrative remedy.  All paragraphs in this complaint shall be deemed to have been incorporated into each other paragraph.  Allegations of violations of Michigan Penal Code are as follows:

### COUNT ONE
### VIOLATION OF TITLE 18 U.S. CODE § 241
### CONSPIRACY AGAINST RIGHTS

219.  If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

220.  They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

221.  Plaintiffs restates the foregoing factual allegations.

222.  Plaintiffs gave Defendant an opportunity to cure violation

223.  Plaintiffs, despite these attempts at reconciliation, were subjected to a conspiracy against their rights by the Defendants acting in their individual capacities (stress this more in compliant) and through actions as the Board of Managers and General Manager.

224.  Plaintiffs as a result of a conspiracy against their rights and despite attempts for Defendants to

correct their wrongdoings were denied their right to peacefully assemble and be free from discrimination in a public place.

WHEREFORE, Plaintiffs demand judgement for declaratory injunction, compensatory and punitive damages against Ron Ireland together with such other and further relief as the Court may deem reasonable and just under circumstances.

**COUNT TWO**

**VIOLATION OF TITLE 18 U.S. CODE § 242 DEPRIVATION OF RIGHTS**

**UNDER COLOR OF LAW**

225.    Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or  by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined  under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned  for any term of years or for life, or both, or may be sentenced to death.

226.    Defendant through publication and correspondence has cited the CDC guidelines as justification for segregating people at the Main Bar and Cabana Area.

227.    The Separation of Powers Doctrine stipulates that only the legislature can enact laws.

228.    The CDC guidelines are not laws.

229.  Michigan Interim Public Health Recommendations for Fully Vaccinated People adopted

CDC guidelines

230.    The state of Michigan guidance are not laws and specifically states that implementation of guidance must be within the bounds of State and Federal law.

231.    WHEREFORE, Plaintiffs demand judgement for declaratory injunction, compensatory and punitive damages against Defendants together with such other and further relief as the Court may deem reasonable and just under circumstances

   a.    Cause damage to property; and

   b.    Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; and

   c.    Use or abuse her position as a public servant by performing some act within or related to his or her official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; and

   d.    Perform any other act which would not in itself materially benefit the actor, but which is calculated to harm another person materially with respect Plaintiff's health, reputation or personal relationships

232.    Without cause and without a lawful basis, Defendant on April 21, 2021: 1) compelled Plaintiff to engage in mask coercion by an individual who lacks a medical license and without consent, 2) labeled Plaintiff as a communicable disease threat without due process, 3) compelled Plaintiff to abstain from his legal right to assemble where he chooses and access a public accommodation.

## COUNT SIX
### PRACTICING MEDICINE WITOUT A LICENSE

244.   Defendants are diagnosing Plaintiff based on his perceived vaccine status and determining he is a communicable threat and administering treatment requiring him to wear a mask and segregate without a license

to practice medicine.  Other members of the Club are also being subject to this unlawful act but may lack awareness of their duty to report crimes.  Determining an individual is a medical threat can only be done with proper due process that involves a licensed physician.

245.    Practicing medicine without a license is a class E felony.

## DEMAND FOR EMPANELMENT OF A FEDERAL GRAND JURY

246.    Plaintiff has proven probable cause for his allegations of criminal misconduct against the Defendants.  Defendants were given several opportunities for administrative remedies but chose to ignore them.  Defendants were made aware their actions could result in criminal action taken against them but dismissed notification as harassment.  A citizen who abstains from reporting a felony can be considered an accessory to that crime according to 18 USC § 4.  Therefore, reporting the aforementioned facts at the state and federal level are a duty of the Plaintiff.

The powers of the court provided under the Judiciary and Criminal Procedure Laws of The State of Michigan allow for remedy for the facts outlined in this complaint.

Defendants' actions are a blatant assault on the Plaintiff's rights.  Despite the illegality of the Defendants' actions Plaintiff sought to illustrate the crimes Defendants' policies and actions were violating before taking definitive action.  Defendants were indignant at all times to Plaintiff and Plaintiff's family and the exercise of their rights.  Defendants became wrathful and decided to intentionally, willfully and with knowledge escalate actions to further violate Plaintiff's rights to that of multiple felonies.  This is important to be addressed due to a society becoming emboldened with false authority under the guise of perceived disabilities.  Most importantly, it is important to address this type of crime to fight for those who can't fight for themselves.

Pursuant to 28 U.S. Code § 1746 (1)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 4/20/2022.

Signed:

Tricia Martinez, Complainant and Declarant